**L & R PREBUILT HOMES, INC.**

v.

**NEW ENGLAND ALLBANK FOR SAVINGS and FDIC as Receiver.**

**No. C–91–349–L.**

United States District Court, D. New Hampshire.

Jan. 16, 1992.

Kathleen Mulcahey–Hampson, Manchester, N.H., for plaintiff.

Jennifer Rood, Backus, Myer & Solomon, Manchester, N.H., for defendants.

ORDER

LOUGHLIN, Senior District Judge.

This case is a harbinger of the plethora of cases that this jurisdiction has been inundated with because of the economic conditions in this state and resulting bank failures.

This court in a somewhat vitriolic opinion dated November 21, 1991 unhappy with the actions or inactions of the FDIC gave precedent to this case on its court calendar. As a result the case was heard on its merits January 7, 1992 in a one day court trial. Most of the facts were either agreed upon or were substantiated or verified by state courts records of Hillsborough and Merrimack Counties.

The court makes the following findings of fact.

The plaintiff corporation performed work and supplied materials to developments in Derry, New Hampshire and Concord, New Hampshire which were being developed by Noah Development, Inc., Westwood Realty, Inc. and Wildwood Realty, Inc. The plaintiff corporation is owned by Lawrence M. Dulac who is the sole shareholder. Dulac, an intelligent forthright man is a plumbing and heating contractor in Manchester, New Hampshire. The development corporations were owned and operated by Norman Aboshar. The projects were financed by the New England AllBank for Savings, then a Massachusetts banking institution, (hereinafter referred to as "the Bank" or "Defendant Bank") with various construction loans.

The financing for the development project was approved by the Bank and these records are part of the bank's records. The loans are a matter of public record and bank records as documented by the mortgages of record at the Merrimack County Registry of Deeds.

Western Financial Group, of Woodland Hills, California purchased certain notes by

the FDIC some of which concerned loans made originally by New England AllBank to Westwood Realty, Inc. and Noah Development, Inc., concerning properties in Derry, New Hampshire and Concord, New Hampshire. Exhibit 1.

Dulac became involved with Norman Aboshar, a real estate developer. Dulac did plumbing and heating on various buildings in Derry and Concord, New Hampshire for Aboshar.

In 1989 Aboshar became ill and died in November of that same year. Arthur Bursey, a former partner of Aboshar attempted to help Aboshar out when illness set in. In the fall of 1989 plaintiff was owed approximately $40,000.00 for work performed. Unable to pay his principal supplier, Colonial Supply, he became anxious about the indebtedness owed him. Two of the buildings involved were in Derry and three in Concord. Plaintiff attempted to reach Charles Stone, President of the Bank.

In the spring of 1990 plaintiff's attempts to meet with Stone had some fruition. Stone in his private helicopter made trips to Cape Cod, Concord and Moultonboro, New Hampshire on the same day. Bursey introduced Stone to the plaintiff when he landed at the Concord site. Stone was on site to deliver checks on the construction loan as a courtesy to other bank officials. At the time Stone was in the process of retiring after forty-two years as a banker.

Charles Stone had been hired by the Bank in 1968 as a Vice–President and within a month was President of the Bank. He was also Chairman of the Board of the Bank. He retired on September 4, 1990.

Stone stated that this was the first time that he was aware of a problem concerning the property. He also stated that he had very little to do with the transactions between the bank and the Aboshar corporations. It was also his testimony that according to banking practices that in order to pay a subcontractor directly there must be an assignment in writing presumably from the contractor or developer.

Plaintiff was offered $11,000.00 towards the indebtedness provided that he did not attach the property for the balance owed to him. Stone told the plaintiff that there was money in escrow to offset the indebtedness so the plaintiff continued working and was paid for the future work. Plaintiff acknowledged that it was unusual for a bank to pay a subcontractor directly unless there was an assignment or agreement by the contractor.

Plaintiff contemporaneously was beset with many financial woes because of his failure to be paid. Plaintiff had to refinance with his bank, St. Mary's, lost his 2% discount and had to pay his principal supplier Colonial Supply 24% interest on his indebtedness with them. He owed the IRS and had to make a $10,000,00 personal loan to satisfy the IRS demands for payment.

Plaintiff filed mechanic's liens in December, 1990 on certain properties in the development projects and also filed suit against the corporations.

Additionally in an effort to recoup some of his loss the plaintiff filed a petition in Hillsborough County Superior Court to attach rental proceeds on five duplexes (ten units). Judge Hampsey ordered the Bank to pay rental proceeds to the plaintiff from June 7, 1990 through and including October, 1990. The Bank was also ordered to do the following which was never done. Quoting from the order "The defendant (Bank) shall also provide plaintiff's counsel with an accounting of the rental proceeds, forthwith, said accounting to be from June 7, 1990 until the dates of foreclosure." The foreclosures were on or about October 31, November 11, 1990. The date of Judge Hampsey's order was October 30, 1990. Plaintiff did receive $8,218.22 from the Bank which was spent immediately for attorney's fees and to pay creditors of the plaintiff.

In October, 1990, the plaintiff filed a Bill In Equity against the Bank to prevent the foreclosure by the Bank in Hillsborough County Superior Court.

The court finds that Charles Stone informed Lawrence Dulac that he would be paid from then extant escrow accounts in March, 1990 when they met at the con-

struction site. At this point in time an individual named Finley was managing the property and collecting rents.

Marlene Aboshar, widow of Norman Aboshar, helped her late husband manage the properties especially so after his illness. In February, 1990 the Bank started to collect rents after sending letters to the Aboshar tenants. Some of the rents involving another mortgage with the Hillsborough, New Hampshire Bank were sent to the Hillsborough Bank as they were dunning Marlene.

In order for the plaintiff to prevail in this action against the FDIC through its predecessor in title, the Bank, it has the following burden. To have something in writing in order to surmount the formidable barrier interposed by the landmark case of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and its codification in 12 U.S.C. § 1823(e).

Plaintiff ingeniously contends that the D'Oench, Duhme doctrine and its codification in the statutes are not apposite as there is no secret agreement involved. Further that the financing for the project was reduced to writing in the form of mortgages and notes; it was approved by the Bank Committee or Board and the documents remained continuously part of the Bank record showing sufficient evidence of the developer's financing agreement with the Bank and the debt to the plaintiff so that the FDIC would not be deceived.

12 U.S.C. § 1823(e) specifically states:

no agreement which tends to diminish or defeat the interest of the FDIC in any asset shall be valid against the FDIC unless such agreement (1) is in writing; (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution; (3) was approved by the Board of Directors of the depository institution or its loan committee, which approval should be reflected in the minutes of said Board or Committee; (4) and has been continuously, from the time of its execution, an official record of the depository institution.

While not directly relevant to the merits of this case the court believes it to be duty bound to make the following comments concerning the actions or better yet inactions of the FDIC. This has nothing to do with FDIC's counsel who acted very professionally and objected to the admission of evidence pertaining to this matter.

The following is incorporated from this court's order of November 21, 1991.

The FDIC was appointed receiver of the Defendant Bank in January, 1991. Plaintiff's counsel called the FDIC and spoke with an attorney for the FDIC regarding the plaintiff's claims in approximately January of 1991. The FDIC recognized the plaintiff as a creditor and forwarded plaintiff's counsel a proof of claims form. Thereafter, on or about April 1, 1991, plaintiff's counsel filed the claim form with the FDIC for the payments due for work on the projects and for the actionable conduct of the Bank against the plaintiff.

Also, in the early part of 1991, the plaintiff through its owner and president, was in contact with the FDIC. He discussed the outstanding mechanic's liens and the amounts due the plaintiff. This is confirmed in writing by the plaintiff's letter to the FDIC dated March 18, 1991 where the plaintiff refers to the "outstanding balance for plumbing and heating cost to us...." (The plaintiff proposed to complete and repair the units, which were unusable and incurring damages. The units could then be rented for a profit and the debt to the plaintiff could be paid down from there. The proposal involved no out-of-pocket costs to the FDIC as the plaintiff would be paid from the rental profits upon completion.)

The plaintiff did not get a response from the FDIC until after he contacted the office of the Chairman of the FDIC and a Congressman. Thereafter, the plaintiff's prior communication and correspondence was answered in a letter from the FDIC dated April 24, 1991, in which the FDIC specifically refers to the plaintiff's mechanic's liens. The FDIC was fully aware of the

plaintiff's claim both through the plaintiff's own notice on or before March of 1991 and plaintiff's counsel's claim in April of 1991.

The court is disturbed about many facets of this case. Plaintiff's counsel alleges that prior to filing this action the FDIC had disallowed plaintiff's claim. Mary E. Corbett, Staff Attorney, by letter dated January 3, 1991, sent proof of claim forms to plaintiff's counsel stating claims must be completed and filed no later than April 4, 1991 contradicting Attorney Rood's contention that the cutoff date was March 17, 1991. The proof of claim was filed by plaintiff's counsel on April 1, 1991 in the sum of $38,299.90. Demand was made on the New England Allbank for Savings on October 11, 1990 by Stephen E. Cormier Deputy Sherriff by virtue of a writ of execution. Robert E. Wallace, Account Officer for the FDIC, by letter of April 24, 1991 apologized to Lawrence M. Dulac President and owner of plaintiff for not responding to Dulac's letter of March 18, 1991. In Dulac's letter of March 18, 1991 he proposed a solution with no added cost, up front money and time from FDIC. Plaintiff's claim has never been paid. Defendant's allegation that the plaintiff failed to exhaust administrative remedies pursuant to 12 U.S.C. § 1821 rings hollow and borders on prevarication.

This is the first case tried fully on its merits in this jurisdiction. The court has full empathy with the plaintiff's position and dilemma, but of course is powerless under the law to grant remedial relief. The court does not quarrel with the D'Oench doctrine, but it is appalled by the manner in which the FDIC reacts to situations such as these.

Unlike its original order the court had credible testimony under oath from Mr. Dulac, Mr. Wenzel, Mrs. Aboshar and Mr. Stone.

Dulac made a proposal to Robert E. Wallace, Account Officer Ore Department, Division of Liquidation of the FDIC by letter dated March 18, 1991. In a response over a month later, Wallace referred Dulac to a Mr. Douglas Fischer, Section Chief, ORE Department. On May 2, 1991 Dulac wrote

Fischer succinctly outlining a proposal. On May 13, 1991 Fischer replied to Dulac's letter stating it was not feasible. The proposal is set forth in greater detail in exhibit P. Briefly what Dulac proposed was the following. At no cost to FDIC Dulac would procure appliances necessary to rent non-furnished units at vacant units. Dulac at his own expense would install them. Finley would rent the units $100.00 to $150.00 below the then prevailing rental rates. From the rents, appliances would be paid as well as taxes, insurance and Dulac's debt with a net to FDIC of approximately $29,700.00. The court is not stating that this is a non-risk proof panacea for economic woes, but it was worth a try. The alternative is now history, everyone took a bath.

This judge lived through the depression as a child and a teenager. Unfortunately FDIC was not extant and many people, including my parents, lost money in failed banking institutions. FDIC was good remedial legislation. Since FDIC became extant, bank failures were unknown until recent times. A laissez-faire attitude should not prevail. The FDIC should cooperate with honest hardworking individuals like Lawrence Dulac in this untoward economic climate who propose seemingly feasible alternatives to the general apathy of FDIC. The court now addresses the issues in this case which are germane.

Reference is made to *Sabbag, Inc. v. FDIC*, 1991 WL 146876, 1991 U.S.Dist.LEXIS 10657 decided July 26, 1991. This case was decided by Judge Rya W. Zobel of the United States District Court for The District of Massachusetts. The facts are somewhat similar to the facts in this case. Succinctly, the plaintiff was a subcontractor who was owed a substantial sum of money by the contractor. A bank employee promised that he would talk to the contractor/developer and see that the plaintiff was paid. Plaintiff's mechanic's lien was subsequently wiped out when the bank foreclosed.

In granting summary judgment the court stated that the purpose of D'Oench is to allow the FDIC to rely on the

bank's records both when it is insuring and taking over a bank. *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 50 (1st Cir.1991). The doctrine growing out of D'Oench "prohibits all secret agreements that tend to make the FDIC susceptible to fraudulent arrangements.... It applies where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing." Id. at 48–49. Thus, it is not necessary that plaintiff be a borrower: "D'Oench applies to any agreement interposed as a claim or defense to enforcement of an asset held by [FDIC]."

 In this case there is no agreement with the bank as codified at 12 U.S.C. § 1823(e).

The FDIC has two separate roles. As receiver, the FDIC manages the assets of the failed bank on behalf of the bank's creditors and shareholders. In its corporate capacity, the FDIC is responsible for insuring the failed bank's deposits. Although there are many options available to the FDIC when a bank fails, these options generally fall within two categories of approaches, either liquidation or purchase and assumption. *Timberland, supra* at 48.

The court finds that the mortgages, history of attachments germane to real property and personal property such as attachment of rents do not satisfy the requirements of the D'Oench, Duhme doctrine or 12 U.S.C. § 1823(e). The court finds that the Bank through its duly authorized representative Charles Stone did promise Lawrence Dulac that there were sufficient funds to pay him from escrow funds, but unfortunately this was not reduced to writing.

The court further finds that the Bank failed to comply with Judge Hampsey's order relative to an accounting. Under the Full Faith And Credit clause of the United States Constitution, Article IV § 1, the Bank is so ordered to do so within thirty days of receipt of this judgment. If the accounting shows that monies are due and owing to the plaintiff within the time period specified by the court order they shall be paid forthwith. With respect to the remaining facets of the plaintiff's case judgment is ordered for the defendant.

The plaintiff also invokes the provisions of RSA § 358–A the New Hampshire Statute entitled Regulation Of Business Practices For Consumer Protection.

This statute is not germane to the facts of this case. Reference is made to § A:2 of the statute defining Acts Unlawful. There are twelve categories of unlawful acts set forth pertaining to goods and services. As the statute is not apposite relief sought under it is denied. See plaintiff's requests for rulings of law, four through twelve.

The actions in tort are also dismissed, see plaintiff's requests for rulings of law, thirteen through seventeen.

Judgment for the defendant conditioned upon the defendant bank complying with Judge Hampsey's order relative to an accounting.