Rockingham
No. 92-703

## DENNIS S. ROBERTS

v.

## GENERAL MOTORS CORPORATION

June 7, 1994

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Robert E. Murphy, Jr.* and *Kathleen N. Sullivan* on the brief, and *Mr. Murphy* orally), for the plaintiff.

*Bingham, Dana & Gould*, of Boston, Massachusetts (*Daniel L. Goldberg* and *Lawrence S. Buonomo* on the brief, and *Mr. Goldberg* orally), and *Brown, Olson & Wilson*, of Concord (*Howard B. Myers* on the brief), for the defendant.

THAYER, J.  The plaintiff, Dennis S. Roberts, initially alleged six claims against the defendant, General Motors Corporation (GMC), for breach of contract; violation of RSA chapter 357-C, which regulates business practices between motor vehicle manufacturers, distributors and dealers (the Dealership Act); tortious interference with contractual relations; tortious interference with advantageous relations; commission of unfair or deceptive acts or practices; and breach of the duty of good faith and fair dealing. The Superior Court (*McHugh*, J.) granted summary judgment to the defendant on all but the last claim, which the plaintiff then voluntarily nonsuited. The plaintiff appeals, arguing that the trial court erred in ruling: (1) that a prospective franchisee has no standing to sue under either the Dealership Act or RSA chapter 358-A, the Consumer Protection Act; and (2) that the facts did not support either a claim for tortious interference with his contractual rights or a claim for breach of contract as a third party beneficiary to GMC's dealership agreement with Wallace Chevrolet. We affirm.

Robert Wallace was the owner of the GMC franchised dealership, Wallace Chevrolet, Inc., in Hampton. In 1987, Wallace Chevrolet notified GMC that it had entered into an agreement with the plaintiff to purchase its assets. Under the terms of the dealership agreement between GMC and Wallace Chevrolet, Wallace Chevrolet could not transfer the franchise absent GMC's consent, which consent could not be withheld arbitrarily. GMC provided the plaintiff with applica-

tion materials and agreed to consider him as the proposed transferee, but told Wallace that it preferred a different candidate to assume the dealership, Edward Byrnes, president of Byrnes Chevrolet.

During the summer of 1987, while it considered the plaintiff's application, GMC decided to designate Hampton as a "minority point," or minority-owned dealership. At that time, Edward Byrnes proposed that one of his employees, James Noble, who is a member of a minority group, be considered as a candidate. In August, a GMC representative met with Noble to provide him with information and application materials. At no time did GMC inform the plaintiff that it intended to designate Hampton as a minority point.

On September 18, GMC notified Wallace Chevrolet that it would exercise its right of first refusal as permitted by the dealership agreement, and that it would purchase Wallace Chevrolet's dealership for the price set forth in the purchase agreement between Wallace Chevrolet and the plaintiff. On September 21, GMC told the plaintiff that although his application was complete and satisfactory, General Motors had decided to exercise its right of first refusal and not grant the plaintiff the Hampton franchise. Ultimately, the dealership was sold to Coastal Chevrolet, fifteen percent of the stock of which was owned by its president, Noble. The instant suit resulted from the plaintiff's disappointed expectations.

■■ Under RSA 491:8-a, III (1983), summary judgment is appropriate where, after considering all of the evidence in the light most favorable to the non-moving party, the trial court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Horse Pond Fish & Game Club v. Cormier*, 133 N.H. 648, 653, 581 A.2d 478, 481 (1990). While the summary judgment procedure is designed to save time, expense, and effort, it is not intended to cut off deserving litigants from their day in court. *Coburn v. First Equity Associates*, 116 N.H. 522, 524, 363 A.2d 402, 404 (1976).

■■ The plaintiff first contends that the trial court erroneously denied him standing to sue under the Dealership Act, RSA ch. 357-C (1984 & Supp. 1993). In evaluating whether a party has standing to sue, we focus on whether the plaintiff suffered a legal injury against which the law was designed to protect. *See State v. Flynn*, 123 N.H. 457, 466, 464 A.2d 268, 273–74 (1983). Therefore, "[t]he issue before us is a matter of statutory construction; accordingly, we must begin our analysis by considering the plain meaning of the words of the

statute." *Gilmore v. Bradgate Associates*, 135 N.H. 234, 237, 604 A.2d 555, 556 (1992). In so doing, we will focus on the statute as a whole, not on isolated words or phrases. *N.H. Div. of Human Services v. Hahn*, 133 N.H. 776, 778, 584 A.2d 775, 776 (1990); *Town of Northampton v. Sanderson*, 131 N.H. 614, 622, 557 A.2d 643, 648 (1989).

The statute conveys standing upon "any person who is injured in his business or property by a violation of this chapter." RSA 357-C:12, II (1984). According to the parties' arguments, this provision is susceptible to two very different interpretations. The plaintiff argues that the statute on its face provides a remedy to "any person" injured, and thus must be broadly construed. GMC counters that the statute must be read as a whole, and more particularly that the provisions upon which the plaintiff bases his claims, RSA 357-C:3, I, III(i), and III(n), are clearly designed not to protect the plaintiff, but rather to protect existing motor vehicle dealers from oppressive conduct.

We find GMC's argument to be more persuasive. While we agree with the plaintiff that the legislature's use of the word "any" generally evidences that a statute should include a broad array of potential plaintiffs, *Gilmore*, 135 N.H. at 234, 604 A.2d at 557; *De-Cato Brothers, Inc. v. Westinghouse Credit Corp.*, 129 N.H. 504, 507, 529 A.2d 952, 954 (1987), here the legislature specifically limited standing to those injured in business or property. Thus, it is a person's "business or property" interest that the statute seeks to protect.

Further, the standing provision must not be isolated from the rest of the statute, but rather must be read in conjunction with the statute as a whole. *Hahn*, 133 N.H. at 778, 584 A.2d at 776. Chapter 357-C does contain provisions protecting automobile consumers, *see, e.g.*, RSA 357-C:3, IV; hence, its purpose in part is to protect the "public interest and welfare." Laws 1981, 477:1. Primarily, however, chapter 357-C is a comprehensive statute governing the relationships between automobile manufacturers and their dealers. The clear intent of the non-consumer-oriented provisions is to protect the investment and property interests of those who are already dealers. These dealer-protection provisions include, *inter alia*, those provisions upon which the plaintiff relies. RSA 357-C:3, III (i), for example, states that a manufacturer may not

> "[p]revent or attempt to prevent any motor vehicle dealer or any officer, partner or stockholder of any motor vehicle

dealer from transferring any part of the interest of any of them to any other person; provided, however, that no dealer . . . shall have the right to sell, transfer or assign the franchise or power of management or control without the consent of the manufacturer or distributor unless such consent is unreasonably withheld. Failure to respond within 60 days of receipt of a written request for consent to a sale, transfer or assignment shall be deemed consent to a request."

RSA 357-C: 3, III(n) declares that a manufacturer may not

"[i]mpose unreasonable restrictions on the motor vehicle dealer or franchisee relative to transfer, sale, right to renew, termination, discipline, noncompetition covenants, site-contract, right of first refusal to purchase, option to purchase, compliance with subjective standards, or assertion of legal or equitable rights."

The statute, taken as a whole, does not include the plaintiff as a person who can claim injury under its terms. Nothing in chapter 357-C prohibits the exercise of a right of first refusal on the part of a franchisor. Nor does the statutory language suggest an intent by the legislature to limit or regulate a franchisor's discretion to select new dealers. The plaintiff has no independent right under the statute to be approved as a GMC franchisee, and he cannot stand upon the rights of Wallace Chevrolet in order to gain standing under the statute. *Ozonoff v. Berzak*, 744 F.2d 224, 228 (1st Cir. 1984); *Flynn*, 123 N.H. at 466, 464 A.2d at 273.

We note additionally that the great majority of other States have construed their dealership statutes to exclude claims such as the instant one. *See, e.g.*, *Knauz v. Toyota Motor Sales, USA, Inc.*, 720 F. Supp. 1327, 1329 (N.D. Ill. 1989); *Statewide Rent-A-Car v. Subaru of America*, 704 F. Supp 183, 185 (D. Mont. 1988); *Beard Motors v. Toyota Motor Distributors, Inc.*, 395 Mass. 428, 433, 480 N.E.2d 303, 305 (1985); *Tynan v. General Motors Corp.*, 591 A.2d 1024, 1028–30 (N.J. Super. 1991), *rev'd in part on other grounds*, 604 A.2d 99 (N.J. 1992). In *Beard Motors*, the Supreme Judicial Court of Massachusetts construed Mass. Gen. L. ch. 93B. Although not a mirror image, RSA chapter 357-C is a substantial counterpart of the Massachusetts statute, in the same way that RSA chapter 358-A resembles Mass. Gen. L. ch. 93A. *New Hampshire Auto Dealers v. General Motors Corp.*, 620 F. Supp. 1150, 1159 (D.N.H. 1985). The Massachusetts statute provides a remedy to "any franchisee or motor vehicle dealer," *Beard Motors*, 395 Mass. at 431, 480 N.E.2d at 305, and

thus is more limited on its face than its New Hampshire counterpart. The court in *Beard Motors* was faced with a plaintiff who *was* an automobile dealer, and within the technical parameters of the standing requirement. The court recognized, however, that

> "not every party who can claim an injury as a result of violations of a statute or regulation has standing to bring an action thereunder. This is true even when a literal reading of the statute, without regard to the Legislature's purpose in enacting it, would appear to provide a broader grant of standing. . . . The scope of the grant of authority to bring an action for violation of [the statute] must be determined with reference to the context of the subject matter of the statute."

*Id.* The court stated that the statute was enacted in "recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers," and thus while it protected current dealers from injuries incurred as a result of their inequality of bargaining power, it did not protect dealer applicants against "the loss of anticipated profits from the sale of [automobiles] and from capital appreciation in the value of the [automobile] dealership, due to [a plaintiff's] inability to obtain the . . . franchise." *Id.* at 433, 480 N.E.2d at 306. This reasoning additionally bolsters our reading of our own dealership statute to exclude claims such as that made by the plaintiff in this case. His claim based upon this statute was properly dismissed by the trial court.

The plaintiff next argues that the trial court erred in finding that the Consumer Protection Act, RSA ch. 358-A (1984 & Supp. 1993), did not apply to his claim. The Consumer Protection Act is a comprehensive statute whose language indicates that it should be given broad sweep. *See Gilmore*, 135 N.H. at 238, 604 A.2d at 557. Despite its broad language, however, it is not unlimited in scope. RSA 358-A:2 (1984 & Supp. 1993) lists thirteen representative categories of unlawful acts or practices, each dealing with transactions for the provision of goods or services to consumers. None encompass the type of transaction that the plaintiff sought, but was denied, with GMC. While the act itself states that it is not limited only to these specific transactions, *see* RSA 358-A:2, we agree with the Massachusetts Appeals Court that "[r]ules of statutory construction lead us to conclude . . . that the phrase 'including but not limited to,' which precedes the specification, limits the applicability of [the Consumer Protection Act] to those *types* of [acts] therein particularized." *Ma-*

*honey v. Baldwin,* 27 Mass. App. Ct. 778, 779–80, 543 N.E.2d 435, 436, *review denied,* 406 Mass. 1102, 546 N.E.2d 375 (1989); *see L & R Prebuilt Homes v. New England Allbank For Sav.,* 783 F. Supp. 11, 15 (D.N.H. 1992). In addition, the statute states that its interpretation should be guided by the construction given to the analogous Federal Trade Commission Act, found in relevant part at 15 U.S.C. § 45(a)(1) (1982). *See* RSA 358-A:13 (1984). We have not found any cases decided under that statute allowing a claim such as that made by the plaintiff. In fact, in analogous refusal-to-deal cases, the Federal Trade Commission and other courts have regularly found the federal statute inapplicable. *See In re Sun Electric Corp.,* 69 F.T.C. 571, 594 (1966) ("[N]o doubt an automobile dealer selling Ramblers might be 'injured' — in the sense of losing potential profit — if he were denied a Chevrolet franchise by General Motors. But it certainly does not follow that GM's denial to him of a Chevrolet franchise is unlawful."); *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 599, 321 N.E.2d 915, 919 (1975) ("Our careful examination of the Federal acts and their interpretation has led us to the conclusion that a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice.").

The plaintiff next argues that the trial court erroneously rejected his claim that GMC tortiously interfered with his contractual relationship with Wallace Chevrolet. In order to bring a claim for tortious interference, the plaintiff must show that he had a contractual relationship with Wallace Chevrolet of which GMC was aware; that GMC wrongfully induced Wallace Chevrolet to breach that contract; and that the damages claimed were proximately caused by that interference. *Montrone v. Maxfield,* 122 N.H. 724, 726, 449 A.2d 1216, 1217 (1982). The trial court applied the *Montrone* test, and while it found that the plaintiff could show a contractual relationship between himself and Wallace Chevrolet of which GMC was aware, it found that the plaintiff could not meet the rest of the test. His sole claim for damages for tortious interference was for his lost opportunity to become a GMC franchisee. The trial court found that

"[u]nder no theory can the plaintiff be said to have had any right to become a General Motors dealer. General Motors' dealer contracts, which naturally predate any contract between an existing dealer and an interested third party purchaser, clearly provide for a right of first refusal. There is no

dispute here that Roberts knew that fact at the inception of his purchase discussions with Wallace."

Thus, the trial court found that GMC had properly exercised its right of first refusal to prevent Wallace Chevrolet from transferring the franchise to the plaintiff.

We must determine whether the plaintiff, as a dealer applicant, can legally assert a claim of tortious interference against GMC for its refusal to approve the transfer of the franchise. Only *improper* interference is deemed tortious in New Hampshire. In *Montrone*, the entry of summary judgment against a plaintiff who brought a tortious interference claim against a real estate broker was affirmed because the plaintiff was unable to "create a genuine issue of fact as to whether the defendants wrongfully induced the seller to breach any agreement he may have had with the plaintiff." *Id.* at 726, 449 A.2d at 1217. The real estate agent sued had acted within the purview of his contract with the seller of the property, and thus could not be sued by the disappointed buyer for tortious interference. *Id.*; *see Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 988–89 (1st Cir. 1983) (applying New Hampshire law). In the instant case, GMC argues that it too acted within the purview of its contractual rights in exercising its right of first refusal, and therefore that Roberts can show no wrongful interference resulting in damages.

Section 767 of the RESTATEMENT (SECOND) OF TORTS (1977) sets forth a number of factors to be considered in determining whether an intentional interference with a contractual relationship will be considered tortious:

> "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties."

RESTATEMENT (SECOND) OF TORTS, *supra* § 767. Applicable here is the narrow situation set forth in section 767(d), and fleshed out in section 773:

> "One who, by asserting in good faith a legally protected interest of his own . . . intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."

*Id.* § 773. We will thus analyze the plaintiff's claim in light of whether in interfering with the contract GMC asserted a legally protected interest that GMC believed may have been impaired or destroyed by the performance of the contract between the plaintiff and Wallace Chevrolet.

GMC, like any other franchisor, has a legitimate financial interest in the identity and ability of its franchisees. *See, e.g., Statewide Rent-A-Car, Inc.*, 704 F. Supp. at 186; *Tynan v. General Motors Corp.*, 591 A.2d 1024, 1033 (N.J. Super. A.D. 1991). It provided for the protection of this interest in the right-of-first-refusal clause in its dealership agreement with Wallace Chevrolet, which type of clause we have recognized and enforced. *See, e.g., Smith v. Wedgewood Builders Corp.*, 134 N.H. 125, 131, 590 A.2d 186, 189 (1991); *Baker v. McCarthy*, 122 N.H. 171, 176–77, 443 A.2d 138, 141–42 (1982).

Other courts have recognized a franchisor's legitimate interest in selecting its franchisees. In *Tynan v. General Motors Corp.*, a New Jersey court found that absent protection under the New Jersey dealership statute for a dealer applicant, there would exist no protection for him under the law of tortious interference. *Tynan*, 591 A.2d at 1034. Similarly, the right of the franchisor to select its franchisees has been held to preclude an action by the disappointed prospective transferee for tortious interference. *Statewide Rent-A-Car, Inc.*, 704 F. Supp. at 186.

The plaintiff argues that GMC's conduct was improper because it did not strictly abide by the terms of its contract with Wallace or with the terms of the Dealership Act. The plaintiff, however, had no statutory right to become a franchisee or to enforce the provisions of the Dealership Act, nor was he an intended beneficiary able to enforce the dealership agreement as a third party beneficiary. He

thus has no right to complain on those grounds. We conclude that the plaintiff's claim for intentional interference with contractual relations was properly denied by the trial court.

The plaintiff lastly argues that the trial court erred in denying him status as a third-party beneficiary of the dealership agreement between GMC and Wallace Chevrolet. The dealership agreement provides that Michigan law governs any controversies arising thereunder. *Cf. Allied Adjustment Serv. v. Heney*, 125 N.H. 698, 700, 484 A.2d 1189, 1191 (1989) (parties to contract may choose law of particular jurisdiction to govern their affairs if jurisdiction has significant relationship to the contract). In Michigan, third-party beneficiary law is controlled by a statute, which provides in relevant part:

> "Any person for whose benefit a promise is made by way of contract . . . has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person."

Mich. Comp. Laws § 600.1405 (1981).

The Michigan courts interpret this statute to require a showing that the plaintiff was an intended beneficiary of the contract, not merely an incidental beneficiary:

> "Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give that third person the right to recover for its breach."

*Alden State Bank v. Old Kent Bank*, 180 Mich. App. 40, 44, 446 N.W.2d 599, 602 (1989). To differentiate between intended and incidental beneficiaries, the courts apply an objective test of whether in the contract itself the defendant made "a promise to do something directly to or for the [third party beneficiary]." *Frick v. Patrick*, 165 Mich. App. 689, 694–95, 419 N.W.2d 55, 58 (1988). In *Alden State Bank*, the court determined that a payee on a check wrongfully refused by the drawee bank did not have standing as a third party beneficiary because the contract between the bank and the drawer of the check only incidentally benefited the payees of checks drawn. *Alden State Bank*, 180 Mich. App. at 45, 446 N.W.2d at 602. Sim-

ilarly, the *Frick* court determined that although certain mentally retarded individuals would have benefited from a lease between the State and a property owner made specifically for a home for mentally retarded citizens, the benefit conferred on the individuals was incidental rather than intended. *Frick*, 165 Mich. App. at 695, 419 N.W.2d at 58; *see also Rieth-Riley Const. v. Department of Transp.*, 136 Mich. App. 425, 357 N.W.2d 62 (1984).

The contract involved in this case, like those in *Alden State Bank* and *Frick*, did provide some benefit to the plaintiff. Further, while GMC would be hard-pressed to argue that it did not know that one such as the plaintiff might at some time be benefited by its contract with Wallace Chevrolet, this benefit is no more direct than that of the payee on the check in *Alden State Bank*. GMC made no promises directly to or for the benefit of the plaintiff as opposed to Wallace Chevrolet. Because we determine that any benefit to the plaintiff under the contract between GMC and Wallace Chevrolet was incidental, the plaintiff can make no third-party beneficiary claim under Michigan law.

*Affirmed.*

All concurred.