Rockingham
No. 2005-578

GREENLAND CONSERVATION COMMISSION

v.

NEW HAMPSHIRE WETLANDS COUNCIL & a.

CONSERVATION LAW FOUNDATION

v.

NEW HAMPSHIRE WETLANDS COUNCIL & a.

Argued: July 21, 2006
Opinion Issued: December 19, 2006

*Baldwin, Callen & Hogan, PLLC*, of Concord (*Jed Z. Callen* on the joint brief) for plaintiff Greenland Conservation Commission, and *Thomas F. Irwin*, of Concord, on the joint brief and orally, for plaintiff Conservation Law Foundation.

*Kelly A. Ayotte*, attorney general (*Jennifer J. Patterson*, senior assistant attorney general, on the brief and orally), for the State of New Hampshire.

*McNeill, Taylor & Gallo, P.A.*, of Dover (*Malcolm R. McNeill, Jr.* and *Lynne M. Dennis* on the brief, and *Mr. McNeill* orally), for intervenor Endicott General Partnership.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Amy Manzelli* on the brief), for Newington Conservation Commission, Exeter River Local Advisory Committee, Lamprey River Advisory Committee, and New Hampshire Rivers Council, as *amici curiae.*

BRODERICK, C.J. The plaintiffs, Greenland Conservation Commission (GCC) and Conservation Law Foundation (CLF), appeal an order of the Superior Court (*McHugh*, J.) affirming a decision and order (decision) of the New Hampshire Wetlands Council (wetlands council or council) that affirmed the issuance of a wetlands permit by the wetlands bureau (wetlands bureau or bureau) of the New Hampshire Department of Environmental Services (DES) to Endicott General Partnership (Endicott). That permit allows Endicott to fill 42,350 square feet of wetlands, at twelve locations, for the construction of roadways to serve a proposed housing development in Greenland. We affirm.

The following facts are drawn from the administrative record. Before DES issued the permit that gave rise to this suit, through its wetlands bureau, Endicott received subdivision approval from the Greenland Planning Board for a seventy-nine-lot housing development situated on a 212-acre parcel that includes approximately eighty-five acres of wetlands bordering Norton Brook, two unnamed tributaries to Norton Brook and several vernal pools. The remainder of the parcel consists of uplands. *See* N.H. ADMIN. RULES, Env-Wt 101.95 (defining "upland" as "an area of land that is not a jurisdictional area"); N.H. ADMIN. RULES, Env-Wt 101.50 (defining "jurisdictional area" as "an area that is subject to regulation under RSA chapter 482-A, as described therein"); RSA 482-A:4, II (2001) (describing the non-tidal waters and areas regulated by RSA chapter 482-A as encompassing "all surface waters of the state . . . which contain fresh water, including the portion of any bank or shore which borders such surface waters, and . . . any swamp or bog subject to periodical flooding by fresh water including the surrounding shore"). On June 12, 2002, Endicott filed a "standard dredge and fill application" with the DES wetlands bureau, pursuant to RSA 482-A:3, I (2001), for the construction of roadways across protected wetlands at thirteen locations.

On March 19, 2003, the bureau granted Endicott a permit that included the following project description:

> Fill a total of 61,150 sq. ft. of palustrine wetlands for roadway crossings at 13 locations for a 79-lot subdivision on 212 acres. Approve as mitigation preservation of a total of 98.6 acres, consisting of 20.7 acres of upland and 77.9 acres of wetland, to be placed in conservation easement and held by the Town of Greenland; and creation of 24,829 sq. ft. (one 10,890 sq. ft. area,

and one 13,939 sq. ft. area) of flood plain scrub/shrub and emergent marsh wetlands constructed as compensation for wetland impacts within the 100 year flood plain.

The plaintiffs both requested reconsideration of the decision to issue the permit. After holding a public hearing on the petition for reconsideration, the bureau concurred on two of the four proposed grounds for reconsideration and revoked the permit by letter dated September 13, 2003.

Endicott, in turn, sought reconsideration of the permit revocation, and after holding a hearing on Endicott's petition for reconsideration, the bureau issued a new permit, dated February 4, 2004, that included the following project description:

Fill a total of 42,350 sq. ft. of palustrine wetlands for roadway crossings at 12 locations, including 4,000 square feet for the construction of a 100 linear foot bridge, for a 79-lot subdivision on 212 acres. Approval includes, as mitigation, the preservation of a total of approximately 106 acres, consisting of approximately 27 acres of upland and approximately 79 acres of wetland, to be placed in conservation easement and held by the Town of Greenland; and, creation of 24,829 sq. ft. (one 10,890 sq. ft. area, and one 13,939 sq. ft. area) of flood plain scrub/shrub and emergent marsh wetlands constructed as compensation for wetland impacts within the 100 year flood plain; and, execution of the Atlantic White Cedar Management Plan as prepared by Carex Ecosystems dated 12/6/02, rec'd by DES 12/6/02.

The increased acreage under conservation easement in the new permit included three entire lots, and the new permit also called for establishment of a fifty-foot upland buffer that involved ten more lots.

The plaintiffs appealed the bureau's decision to the wetlands council, *see* RSA 482-A:10, IV-VII (Supp. 2006), which affirmed. After the council denied their motions to reconsider, GCC and CLF filed separate appeals in the superior court, *see* RSA 482-A:10, VIII, X-XVIII (Supp. 2006), which were consolidated. The superior court affirmed the council's decision. This appeal followed.

On appeal, the plaintiffs contend that the trial court erred by: (1) ruling that DES' review authority (as exercised by the wetlands bureau) was limited to assessing the impact of construction activities in protected wetlands (*i.e.*, the twelve permitted wetland crossings) and did not include consideration of the impact that upland activities (*i.e.*, the entire subdivision) might have upon protected wetlands; (2) imposing on the

plaintiffs the burden to develop and present alternative designs to the wetlands bureau; (3) affirming the wetlands council's decision when there was no evidence in the record of project alterations designed to address the issues raised by the wetlands bureau's September 13, 2003 permit revocation; (4) failing to address critical grounds for appeal concerning failures by Endicott and the bureau to properly address the impacts of the proposed project; and (5) affirming the council's decision, even though the council applied an overly deferential standard of review and failed to specify the factual and legal bases of its decision.

The trial court's review of wetlands council decisions is governed by RSA 482-A:10, XI (2001), which provides:

> On appeal to the superior court, the burden of proof shall be upon the party seeking to set aside the decision of the council to show that the decision is unlawful or unreasonable. The council's decision shall not be set aside or vacated, except for errors of law, unless the court is persuaded, by a preponderance of the evidence before it, that said decision is unjust or unreasonable.

*Conservation Law Found. v. N.H. Wetlands Council,* 150 N.H. 1, 3 (2003). We, in turn, will not disturb the trial court's decision unless it is unsupported by the evidence or legally erroneous. *Id.* at 4.

I

The plaintiffs first argue that the wetlands bureau, the wetlands council, and the trial court all adopted an unlawfully narrow view of DES' statutory scope of review. On the plaintiffs' reading, RSA chapter 482-A (2001 & Supp. 2006) obligated the bureau to consider not just the effects of the filling necessary to construct the twelve approved wetland crossings, but also the effects of the housing development as a whole, including upland construction activities, on protected wetlands. Among other things, the plaintiffs point to the discharge of stormwater runoff and habitat fragmentation as negative effects that will result from the construction of seventy-six homes (seventy-nine lots minus the three lots placed under conservation easement) and related infrastructure. According to the plaintiffs, the trial court erred, as a matter of law, because its decision concerning the extent of DES' project review and permitting authority: (1) violated RSA 482-A:1; (2) violated DES' wetland rules; (3) is inconsistent with DES' prior implementation of RSA chapter 482-A and its wetland rules; and (4) is inconsistent with both the permit the wetlands bureau ultimately issued to Endicott and representations DES officials made during the permitting process. We address each argument in turn.

The plaintiffs' statutory argument rests upon the section of chapter 482-A titled "Finding of Public Purpose." According to that section:

> It is found to be for the public good and welfare of this state to protect and preserve its submerged lands under tidal and fresh waters and its wetlands, (both salt water and fresh-water), as herein defined, from despoliation and unregulated alteration, because such despoliation or unregulated alteration will adversely affect the value of such areas as sources of nutrients for finfish, crustacea, shellfish and wildlife of significant value, will damage or destroy habitats and reproduction areas for plants, fish and wildlife of importance, will eliminate, depreciate or obstruct the commerce, recreation and aesthetic enjoyment of the public, will be detrimental to adequate groundwater levels, will adversely affect stream channels and their ability to handle the runoff of waters, will disturb and reduce the natural ability of wetlands to absorb flood waters and silt, thus increasing general flood damage and the silting of open water channels, and will otherwise adversely affect the interests of the general public.

RSA 482-A:1. The plaintiffs argue that the language quoted above, "combined with basic principles of wetlands ecology," establishes the need for the review process outlined in chapter 482-A to consider not just the impacts of the twelve wetland crossings, but also the impacts of the subdivision as a whole, including both its upland and wetland components. We do not agree.

Chapter 482-A is titled "Fill and Dredge in Wetlands," and the permits granted under that chapter are referred to in the statute as "Excavating and Dredging Permit[s]." RSA 482-A:3, I. The title of a statute is not conclusive of its interpretation, *State v. Rosario*, 148 N.H. 488, 491 (2002), but it is a significant indication of the intent of the legislature in enacting a statute, *see Appeal of Weaver*, 150 N.H. 254, 256 (2003). Here, the title of chapter 482-A strongly indicates that the legislature intended it to protect wetlands only from the effects caused by dredging and filling within their boundaries.

The part of the statute that describes the permitting process provides, in pertinent part:

> No person shall excavate, remove, fill, dredge or construct any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state without a permit from the department. The permit application together with a detailed plan and a map showing the exact location of the proposed project . . .

shall be submitted .... Fees for minor and major projects shall be assessed based on the area of dredge, fill, or construction proposed ....

RSA 482-A:3, I. This language plainly establishes the scope of the project review and permitting authority granted to DES and exercised by DES through its wetlands bureau. DES is authorized to grant permits for certain enumerated construction activities in or on banks, flats, marshes and swamps in and adjacent to state waters. *Id.* DES is not authorized to grant dredge and fill permits for construction activities not listed in the statute or conducted anywhere other than the places listed in the statute. *See State v. Simone,* 151 N.H. 328, 330 (2004) ("Normally, the expression of one thing in a statute implies the exclusion of another."). The permitting process described in RSA 482-A:3, I, is the way the legislature has determined that DES shall carry out the purposes described in RSA 482-A:1. We note, however, that while the scope of chapter 482-A limits DES to the assessment of construction activities in wetlands when it issues dredge and fill permits, upland construction activities such as those proposed by Endicott in this case are subject to various other forms of DES review. *See, e.g.,* RSA 485-A:17 (Supp. 2006) (DES permit required when "any person propos[es] to significantly alter the characteristics of the terrain, in such a manner as to impede the natural runoff or create an unnatural runoff"); RSA 485-A:29 (Supp. 2006) (DES approval required for most sewage and waste disposal systems). Thus, our determination that chapter 482-A does not authorize DES to assess the impacts of upland construction does not mean that Endicott's upland construction activities are entirely free from DES review.

While it may be argued, based upon principles of wetlands ecology, that the purposes described in RSA 482-A:1 could be better served by the sort of review process the plaintiffs advocate—a matter upon which we offer no opinion—the proper place for making such arguments is before the legislature. *See Scheffel v. Krueger,* 146 N.H. 669, 672 (2001) ("Where the legislature has made specific exemptions, we must presume no others were intended. If this is an omission, the courts cannot supply it. That is for the Legislature to do." (quotation and citations omitted)).

The plaintiffs' regulatory argument is equally unavailing. According to the plaintiffs, the trial court erred by ruling that the wetlands bureau had no obligation to assess the effects of upland construction on protected wetlands because the administrative rules governing the wetlands bureau: (1) require the bureau to consider impacts on wetlands; (2) do not distinguish between direct and indirect impacts; and (3) do not define the term "project" to refer only to activities occurring within protected

wetlands. While it is well settled that an administrative agency must follow its own rules and regulations, *Appeal of Town of Nottingham*, 153 N.H. 539, 554-55 (2006), the plaintiffs' argument fails for two reasons. First, when read as a whole, the regulations upon which the plaintiffs base their argument, New Hampshire Administrative Rules, Env-Wt 302, do not authorize the bureau to assess the impacts of upland construction upon protected wetlands. *See Nottingham*, 153 N.H. at 555 (explaining that agency rules are construed as a whole and their words are given their plain and ordinary meanings). What those regulations do allow is for the bureau to assess the impact of construction in wetlands and to impose conditions, including mitigation, in order to protect wetlands. Moreover, any portion of those regulations that might purport to authorize the type of assessment advocated by the plaintiffs would be without effect, because agency regulations that contradict the terms of a governing statute exceed the agency's authority. *See id.* Accordingly, the trial court did nor err by rejecting the plaintiffs' regulatory argument.

The plaintiffs next argue that the trial court's decision was erroneous because in the past, the wetlands bureau has considered the impacts of upland construction upon protected wetlands and, on at least one occasion, denied a permit on that ground. There are two problems with the plaintiffs' argument. First, the permitting decision upon which the plaintiffs rely, concerning a proposed highway bypass in Troy, did not address the impacts of upland development on protected wetlands; it addressed the impact of wetland destruction on the habitat value of upland areas connected by the 6.9 acres of wetlands that the department of transportation proposed to dredge and fill. In denying the Troy permit, DES explained:

> The project has severe impacts on significant wetland and surface water resources that play an integral role in the habitat value and viability of a large unfragmented forested ecosystem which includes forested wetlands of high functional value. Unnecessary destruction of vital wetland and surface water components of that larger ecosystem is contrary to the public purpose of RSA 482-A:1 . . . .

Based upon the foregoing, the permit application for the Troy project is not analogous to the application in this case. If anything, it represents the converse. Second, even if the situation surrounding the Troy project were factually analogous, and DES had denied the application on the grounds advocated by the plaintiffs in this case, *i.e.*, the adverse impact upon wetlands resulting from upland construction, such a decision would have been unlawful, for reasons we have already explained, and there is no

principle of law that would compel, or even allow, DES to overstep its statutory authority a second time, simply because it did so once before. To the contrary, in *State Employees' Assoc. v. State*, 127 N.H. 565 (1986), we held that even when an agency had erroneously interpreted its statutory authority for nine years, that was not enough to change the plain meaning of the statute and legally justify further agency conduct in conflict with the statute, *id.* at 569.

The plaintiffs' final argument for requiring DES to consider the effects of upland construction on protected wetlands is that DES itself, both in the wetlands bureau's permit approval document and at the wetlands council hearing, took actions and made statements demonstrating that it believed it did have the authority to regulate upland activities to protect wetlands. In particular, the plaintiffs point to several conditions the wetlands bureau placed upon the permit approval, such as the requirement that three lots not be developed and the establishment of a fifty-foot buffer zone. Whatever various DES officials may have said, orally or in writing—and we do not interpret the actions and statements identified by the plaintiffs as conflicting with DES' statutory authority—those officials were without power to extend the scope of the agency's authority, *see Nottingham*, 153 N.H. at 555, and, as we have explained, RSA chapter 482-A does not authorize the review process the plaintiffs advocate.

Further, we disagree with the plaintiffs' argument that the trial court's decision was erroneous because its legal conclusions are inconsistent with the permit ultimately issued to Endicott. In support of that argument, the plaintiffs point to the fifty-foot buffer zone that was made a condition of approval and argue that if the bureau was without authority to consider or regulate activities conducted beyond the boundaries of protected wetlands, then it was also without authority to impose a condition that impinged upon uplands, a category of terrain that, by definition, falls outside DES' wetlands jurisdiction. *See* N.H. ADMIN. RULES, Env-Wt 101.95 ("'Upland' means an area of land that is not a jurisdictional area."); N.H. ADMIN. RULES, Env-Wt 101.96 ("'Upland buffer' means an area of land that is contiguous to a jurisdictional resource and that contributes to the functions and values of that resource.").

The plaintiffs' argument is not persuasive. The plain meaning of the statute does not prohibit DES from imposing permit conditions that may have an effect on uplands. Rather, it limits DES to engaging in such consideration or regulation only when it arises directly from its assessment of proposed filling and dredging in wetlands—the activities that give DES jurisdiction in the first place, and for which an applicant seeks a permit. *See* RSA 482-A:11, II (2001) (DES may place conditions upon permits to protect the public good).

■ For all of the foregoing reasons, the trial court did not err by ruling that DES' review authority was limited to assessing the impacts of construction activities in protected wetlands, and did not extend to assessing the effects of upland construction activities upon such wetlands.

## II

The plaintiffs next argue that the trial court impermissibly required them to bear the burden of developing alternative project designs and presenting them to the wetlands bureau.

The relevant DES regulation requires a permit applicant to "provide evidence which demonstrates that . . . (1) [p]otential impacts have been avoided to the maximum extent practicable; and (2) [a]ny unavoidable impacts have been minimized." N.H. ADMIN. RULES, Env-Wt 302.03(a). On appeal, both to the wetlands council and to the superior court, the burden is on the party seeking to set aside a decision to prove that the decision was unlawful or unreasonable. RSA 482-A:10, V, XI.

At the superior court hearing on the plaintiffs' appeal of the wetlands council's decision, the trial judge asked CLF's counsel the following question:

> And—not that you are required to, but as part of your defense of this, you haven't retained anyone to take a look at this and say if you cut it to 40 lots, it's a doable project without the—you don't want to make the 12 crossings et cetera? You don't have that information?

In its order, the trial court observed that "[t]he plaintiffs . . . throughout the permitting process could have suggested the elimination of specific lots or specific crossings" and went on to note:

> [D]uring the hearing before the Court on June 16, 2005, they were able to identify four particular crossings each servicing three proposed house lots and suggested that the denial of these crossings and elimination of those house lots would be the "least impacting alternative" in this case. That argument simply comes too late; it should have been made to DES when the application was first filed.

According to the plaintiffs, the trial court's question at the hearing and the foregoing language from its order reflect an impermissible shifting of the burden of proof stated in Rule 302.03(a) from the applicant to the opponents of the permit application. We do not agree.

■ It is clear from both the superior court hearing transcript and the court's order that the court correctly allocated the burden of proof. The supposed evidence to the contrary identified by the plaintiffs must be understood in its proper context. When the trial judge asked whether the plaintiffs had retained an expert to determine how many building lots would constitute adequate minimization of unavoidable impact, the question presupposed the correctness of the plaintiffs' contention that DES had the authority to assess the impact of upland construction on protected wetlands. That made the question nothing more than a hypothetical. Because DES does not, in fact, have the authority to assess the impacts of upland construction activities—as the trial court correctly ruled—the plaintiffs' failure to present information to the wetlands bureau concerning the acceptable number of house lots was, necessarily, immaterial to the court's decision to affirm the wetlands council's decision. So, too, with the statements in the trial court's order to which the plaintiffs object. Those statements are dicta, and the second one was plainly labeled as such by the court's own preface that "the plaintiffs' strategy [for opposing the permit application] [was] of no interest."

In short, there is nothing in the record to support the plaintiffs' argument that the trial court based its decision upon an erroneous burden of proof.

## III

The plaintiffs next argue that the trial court erred by affirming the decision of the wetlands council even though the record contains no evidence of project alterations designed to address "key dispositive findings" in the September 17, 2003 denial.

In the September 17 denial, the wetlands bureau made six findings "with respect to demonstrated need per Rule [Env-]Wt 302.01(b) and [Env-]Wt 302.04(a)(1)," one of which provided that "design alternatives exist, including alternative lot layouts, that allow development of the property while eliminating several of the proposed crossings." In the plaintiffs' view, the bureau's subsequent decision to reverse its denial and grant the permit was unlawful, and unsustainable on appeal, because the bureau ignored that finding in its decision to grant the permit.

■ The plaintiffs' argument is unavailing for several reasons. First, there is no basis for labeling this finding "dispositive." Second, the plaintiffs mischaracterize the finding as pertaining to avoidance and impact minimization, see N.H. ADMIN. RULES, Env-Wt 302.03(a)(1)-(2), when the September 17 decision characterized it as pertaining to demonstrated need, see N.H. ADMIN. RULES, Env-Wt 302.01(b),

302.04(a)(1). Third, the plaintiffs are mistaken in characterizing the finding as evidence that DES' review process involved an assessment of the impact of the project as a whole, including upland development, upon protected wetlands. Rather, the finding represented nothing more than an attempt to minimize the number of wetland crossings, *i.e.*, direct impacts upon wetlands within DES' dredge and fill jurisdiction. In addition, the plaintiffs offer no legal support for the proposition that the wetlands bureau was required to specifically address each of the findings in the September 17 denial in its subsequent decision to grant the permit. Finally, because DES has the authority to reconsider its decisions, *see* RSA 482-A:10, I-III, it would have been well within the bureau's authority to retract the finding after receiving additional evidence at the hearing on Endicott's request for reconsideration. Accordingly, the trial court did not err by affirming the decision of the wetlands council despite the fact that the project the bureau ultimately approved did not involve a redesign that eliminated several wetland crossings.

## IV

Next, the plaintiffs argue that the trial court erred by failing to address six "critical, potentially outcome-determinative grounds for appeal." Those grounds for appeal, discussed at length in the plaintiffs' post-hearing memorandum, include: (1) the wetlands bureau's failure to consider direct impacts upon an Atlantic white cedar wetland community; (2) the lack of baseline data on Norton Brook and projections concerning the discharge of pollutants into the brook; (3) DES' reliance upon its "site specific" division to analyze certain impacts upon water resources rather than having those impacts addressed by the wetlands bureau; (4) Endicott's failure to assess the impacts of wetland crossings upon the quality of water in adjacent vernal pools; (5) the bureau's failure to address significant project-specific wildlife concerns; and (6) the bureau's failure to assess either the cumulative impacts of the project, as required by New Hampshire Administrative Rules, Env-Wt 302.04(a)(16), or the project's impacts upon the function and values of the total wetland complex, as required by New Hampshire Administrative Rules, Env-Wt 302.04(a)(17).

■ Review of the plaintiffs' post-hearing memorandum demonstrates that the first five arguments are without merit. Each relies, to a greater or lesser extent, upon a pair of legally untenable premises. One has already been addressed: the plaintiffs' incorrect belief that the RSA chapter 482-A permitting process authorizes DES to consider the impacts of upland construction upon protected wetlands. The second faulty premise is that DES is authorized to consider not just the impact of dredging and filling in

wetlands, but also the impacts projected to result from the future use of a structure the construction of which required permitted dredging and filling. For example, the plaintiffs contend that DES was obligated to assess the impact of sand and salt runoff from roadways over wetland crossings constructed pursuant to the dredge and fill permit for which Endicott applied. As with their upland impact argument, the plaintiffs read the scope of RSA chapter 482-A too broadly. The impacts to wetlands that RSA chapter 482-A authorizes DES to consider are those created by excavating, removing, filling, dredging and constructing structures in or on banks, flats, marshes and swamps in and adjacent to state waters. RSA 482-A:3. The statute does not authorize DES to consider impacts created by the subsequent use of structures constructed under duly issued wetlands permits. Because the plaintiffs' first five arguments all depend upon one or both incorrect legal premises, they are all without merit.

According to the plaintiffs, the trial court also erred by failing to address their argument that Endicott failed to assess, and the wetlands bureau did not properly consider, the cumulative impacts of the project or its impacts upon the functions and values of the total wetland complex. The relevant DES regulations provide:

> (a) For any major or minor project, the applicant shall demonstrate by plan and example that the following factors have been considered in the project's design in assessing the impact of the proposed project to areas and environments under the department's jurisdiction:
>
> . . . .
>
> (16) The cumulative impact that would result if all parties owning or abutting a portion of the affected wetland or wetland complex were also permitted alterations to the wetland proportional to the extent of their property rights. For example, an applicant who owns only a portion of a wetland shall document the applicant's percentage of ownership of that wetland and the percentage of that ownership that would be impacted;
>
> (17) The impact of the proposed project on the values and functions of the total wetland or wetland complex[.]

N.H. ADMIN. RULES, Env-Wt 302.04.

In its June 10, 2002 application to the wetlands bureau, Endicott described the wetlands on its property:

> For purposes of the functions and values assessment completed as part of this application, the wetland areas on-site were divided into areas A, B, and C. Area A corresponds to the Norton Brook drainage system, and areas B and C correspond to the drainage systems of two unnamed tributaries to Norton Brook. These wetlands areas are all part of one watershed.

According to the application, "[a]ll impacts to wetlands are associated with construction of access roadways to service the subdivision, and the construction of spans and/or box culverts over Norton Brook, unnamed tributaries to Norton Brook, and unnamed wetlands."

To address Rule 302.04(a)(16), the application provided: "This project has been designed to minimize the amount of wetland impact relative to the area of wetland on the property. Any cumulative impacts would be negligible providing the abutters impacted wetland proportional to their property rights[.]" Thus, notwithstanding the plaintiffs' argument to the contrary, Endicott did address the cumulative impact factor, and demonstrated in its application materials that it proposed to fill less than 1.7 percent of the wetlands on the site. That is sufficient to satisfy the requirements of Rule 302.04(a)(16). Because the factual basis for the plaintiffs' argument—that Endicott failed to address the cumulative impact factor—is plainly erroneous in light of the record, the trial court cannot be faulted for declining to address that argument.

So, too, with the plaintiffs' argument concerning the values and functions factor. To address Rule 302.04(a)(17), the application provided:

> Proposed impacts are minimal in relation to the overall size and character of the wetland areas. The project proposes to impact only 1.69% of the total wetlands on the site. Measures will be taken to minimize the effect on the functions or values of the wetland areas. A functions and values assessment is included in this application. The principal functions and values currently provided include groundwater recharge/discharge, floodflow alteration, fish and shellfish habitat, sediment/toxicant retention, nutrient removal, production export, sediment/shoreline stabilization, wildlife habitat, and uniqueness/heritage (the wetland system contains potential feeding and breeding habitat for two "special concern" turtle species and supports an Atlantic white cedar stand). The Conservation Easement areas associated with the project will ensure the large wetland areas on the property continue to provide these functions and are protected. The proposed roadways represent fragmentation of habitat from

a wildlife perspective, but the wetlands will remain contiguous via appropriately sized spans and box culverts.

As suggested by the foregoing passage, the application materials did indeed include a "Wetland Function—Value Evaluation Form" for each of the three enumerated wetland areas on the property. Thus, the record does not support the plaintiffs' contention that Endicott failed to address the values and functions factor, which completely undermines any argument that the trial court erred in its treatment of that issue.

█ Moreover, because the plaintiffs' argument that the wetlands board did not properly consider the factors set out in Rules 302.04(a)(16) and (17) is premised exclusively upon the erroneous contention that Endicott did not address those factors in its application, there is no basis for arguing that the wetlands bureau failed to consider the project's cumulative impacts or its impacts upon the values and functions of the total wetland complex.

V

The plaintiffs further argue that the trial court's affirmance of the wetlands council's decision was legally erroneous because the council applied an overly deferential standard of review and failed to specify the factual and legal grounds for its decision.

Regarding the standard of review, the plaintiffs take issue with the following portion of the wetlands council's decision:

By Rule, the Wetlands Council considers decisions of the Department of Environmental Services, Wetlands Bureau ("DES"), to be *prima facie* reasonable and lawful unless an appellant can successfully overcome this rebuttable presumption. An appellant can do this by presenting the Council with a preponderance of clear and concise evidence that otherwise persuades the Council such a decision was unreasonable and/or unlawful.

The Council finds that by Rule it cannot substitute its independent judgment of the facts and circumstances of a decision for that used by DES in its own deliberations. It can instead only decide if, given the facts and circumstances presented to it by (a) the Certified Record of the particular application and (b) the interested parties during the formal processes of review and reconsideration below, that the resulting Bureau decision was unreasonable and/or unlawful.

In the plaintiffs' view, the wetlands council unlawfully extended the statutory presumption of *prima facie* lawfulness and reasonableness from questions of fact to the decision as a whole. We do not agree.

The standard of review for the wetlands council is set forth in RSA 482-A:10, V, which provides, in pertinent part:

> The appeal shall be determined upon the record below. The burden of proof shall be on the party seeking to set aside the department's decision to show that the decision is unlawful or unreasonable. All findings of the department upon all questions of fact properly before it shall be prima facie lawful and reasonable.

While the wording of the wetlands council's decision is unconventional, it is not legally erroneous. Rather than speaking in terms of a decision as a whole, most statements about the standard of review on appeal are phrased in terms of the deference due to findings of fact and the lack of deference accorded to rulings of law. *See, e.g., Appeal of Int'l Bhd. of Police Officers*, 148 N.H. 194, 195 (2002) ("We presume the PELRB's findings of fact to be lawful and reasonable. We act as the final arbiter of the meaning of the statute, however, and will set aside erroneous rulings of law." (citation and quotation omitted)). While such phrasing may be the better practice, there is support in our prior opinions for the wetlands council's statement of its standard of review. When reviewing the decisions of a variety of state agencies under RSA 541:13, which is phrased similarly to RSA 482-A:10, V, we have given those decisions—not just their factual findings—a presumption of validity. *See, e.g., Appeal of Dep't of Safety*, 123 N.H. 284, 285 (1983) ("The [New Hampshire Personnel] [C]ommission's orders come to us with a presumption of lawfulness and reasonableness."); *Appeal of National Advertising Co.*, 122 N.H. 1058, 1060 (1982) ("Both parties agree that a commissioner[] [of public works and highways'] decision is *prima facie* lawful . . . ."); *State Farm Mut. Auto. Ins. v. Whaland*, 121 N.H. 400, 403 (1981) ("An order of the [insurance] commissioner is presumed to be prima facie lawful and reasonable and will be overturned only when a plaintiff shows by a clear preponderance of the evidence that it is unreasonable or unlawful."). Accordingly, the wetlands council's statement of its standard of review, if imprecise, was not incorrect as a matter of law. Because the wetlands council did not misstate its standard of review, the trial court, necessarily, did not err by affirming the wetlands council's decision on that issue. Moreover, presuming that the plaintiffs' real concern is that the wetlands council applied a deferential rather than *de novo* standard of review to the wetlands bureau's legal

conclusion that RSA chapter 482-A does not authorize DES to assess the impacts of upland construction upon protected wetlands, any such error would have been corrected at the next stage of the appellate process, when the superior court correctly applied the *de novo* standard of review to the wetlands council's legal determinations.

Finally, the plaintiffs contend that the trial court erred by affirming the decision of the wetlands council because the council failed to specify the factual and legal bases for its decision to affirm the issuance of Endicott's permit.

After the wetlands council issued its decision in favor of DES, DES moved for clarification, asking the council to specify the legal and factual bases for its decision. The council granted DES' motion, but declined to issue specific findings of fact or rulings of law, explaining that when an appellant fails to rebut the presumption that a DES decision is lawful and reasonable, the council is not required "to make findings of fact or rulings of law to explain, or to otherwise justify, how a decision of the Department was reasonable and/or lawful."

On appeal to the superior court, the plaintiffs noted, among other things, that the wetlands council's decision failed to identify any of the nineteen grounds for appeal it had accepted. While agreeing with the plaintiffs that the wetlands council could have provided more detail in its decision, the trial court concluded that because the council seemingly accepted DES' position on all issues, and because DES' findings were well supported in an administrative record that encompassed more than 4,500 pages—which the trial court reviewed itself—it was not necessary to remand the case for a more detailed decision from the wetlands council.

The plaintiffs argue that the plain language of RSA 482-A:10, VI requires the council to specify the factual and legal bases for all of its decisions—whether affirming or remanding—in order to ease the burden on the superior court when it hears appeals from the wetlands council. DES contends that the statute only requires factual and legal findings when the council determines that a DES decision is unlawful or unreasonable and remands the case. We do not agree.

██ The statute governing wetlands council review of DES wetlands permitting decisions provides:

> On appeal, the council may affirm the decision of the department or may remand to the department with a determination that the decision complained of is unlawful or unreasonable. The council shall specify the factual and legal basis for its determination and shall identify the evidence in the record that supports its decision.

RSA 482-A:10, VI. While it is perhaps arguable that the second sentence of paragraph VI directs the council to specify the factual and legal basis for its determinations only when it remands a decision to the department, such a reading is inconsistent with the statute as a whole. *See City of Rochester v. Corpening,* 153 N.H. 571, 573 (2006) ("We interpret statutes in the context of the overall statutory scheme and not in isolation." (citation omitted)). RSA 482-A:10 contemplates not only remands to the department, but also appeals to the superior court. *See* RSA 482-A:10, VIII-XVII. In this case, the council's failure to specify the factual and legal basis for its affirmance deprived the trial court of the benefit of the council's expertise in wetland matters, left the court to surmise the basis for the council's decision, and obligated the trial court to undertake its own examination of a lengthy, complex and highly technical record. This could not have been the intent of the legislature. *See, e.g.,* RSA 541:6 (1997) (requiring application for rehearing as prerequisite for judicial appeal of agency decision, signaling legislative preference for resolution by agency with specific expertise). Accordingly, we hold that RSA 482-A:10, VI requires the wetlands council to provide findings and rulings both when it remands and when it affirms.

Ordinarily, we would remand to the superior court with instructions to remand to the council to make the requisite findings and rulings. *See Chester Rod & Gun Club v. Town of Chester,* 152 N.H. 577, 583-84 (2005). We need not do so in this case, however, because the trial court determined, as a matter of law, based upon its review of the certified record, that the council's decision was legally correct. *See id.* at 583. Having reviewed the certified record ourselves, we hold that it was sufficient for the court to reach this conclusion. *See id.*

Because the order of the trial court is neither legally erroneous nor unsupported by the evidence, it is affirmed.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.