HICKS, J., dissenting.
 

 Because I agree with the Public Utilities Commission (PUC) that Eversource's proposal "is fundamentally inconsistent with the purposes of restructuring," I respectfully dissent.
 

 The majority disagrees with the PUC's determination that "the overriding purpose of the Restructuring Statute," RSA chapter 374-F, "is to introduce competition to the generation of electricity," and instead concludes that "the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers." It therefore interprets RSA chapter 374-F (the Restructuring Statute) to authorize the PUC to expressly undermine competition and to reintegrate electricity generation costs and services with those of transmission and distribution should the PUC find that "other policy principles identified in the statute clearly outweighed functional separation and that the proposal would produce more reliable electric service at lower rates for New Hampshire consumers than presently exists without any significant adverse consequences."
 

 In reaching its construction of the Restructuring Statute, the majority applies a number of admittedly well-recognized tools of statutory construction to interpret selected terms within the statute-for example, consulting a dictionary to define the term "interdependent" and interpreting the term "shall" to "establish[ ] a mandatory duty," in contrast to "should," which the majority construes to permit discretion. In doing so, however, the majority misses the forest for the trees.
 

 I begin with the recognition that when "we examine ... statutory language, we do not merely look at isolated words or phrases, but instead we consider the statute as a whole."
 
 In the Matter of Maves & Moore
 
 ,
 
 166 N.H. 564
 
 , 566-67,
 
 101 A.3d 1
 
 (2014). "In so doing, we are better able to discern the legislature's intent, and therefore better able to understand the statutory language in light of the policy sought to be advanced by the entire statutory scheme."
 
 Id.
 
 at 567,
 
 101 A.3d 1
 
 . "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme."
 
 State Employees Assoc. of N.H. v. N.H. Div. of Personnel
 
 ,
 
 158 N.H. 338
 
 , 343,
 
 965 A.2d 1116
 
 (2009) (quotation omitted).
 

 Read as a whole, the Restructuring Statute clearly evinces that, while the reduction of consumer electricity costs was both the impetus for the Restructuring Statute and the anticipated result of its enactment and implementation,
 
 see
 
 RSA 374-F:1 (2009), it was not an end to be obtained by
 any means the PUC should think appropriate. Indeed, even assuming the majority's point that "the primary intent of the legislature in enacting RSA chapter 374-F was to reduce electricity costs to consumers," it would be "quite mistaken to assume ... that whatever might appear to further the statute's primary objective must be the law."
 
 Henson v. Santander Consumer USA Inc.
 
 , --- U.S. ----,
 
 137 S.Ct. 1718
 
 , 1725,
 
 198 L.Ed.2d 177
 
 (2017) (quotations and brackets omitted);
 
 see
 

 also
 

 State v. Dor
 
 ,
 
 165 N.H. 198
 
 , 205,
 
 75 A.3d 1125
 
 (2013) (noting same).
 

 In RSA chapter 374-F, the legislature did not simply mandate rate reduction, but clearly expressed the means by which it sought to achieve that result. The statute's statement of purpose, for instance, provides:
 

 The most compelling reason
 
 to restructure
 
 the New Hampshire electric utility industry is to reduce costs for all consumers of electricity
 
 by harnessing the power of competitive markets
 
 . The overall public policy goal
 
 of restructuring
 
 is to develop a more efficient industry structure and regulatory framework that results in a more productive economy by reducing costs to consumers while maintaining safe and reliable electric service with minimum adverse impacts on the environment. Increased customer choice and
 
 the development of competitive markets
 
 for wholesale and retail electricity services are key elements in
 
 a restructured industry
 
 that will require unbundling of prices and services and at least functional separation of centralized generation services from transmission and distribution services.
 

 RSA 374-F:1, I (emphases added). The legislature sought to reduce electricity costs, to be sure, but sought to do so by restructuring the industry to introduce competition into the market for electricity generation.
 
 See
 

 Appeal of Campaign for Ratepayers Rights
 
 ,
 
 145 N.H. 671
 
 , 673,
 
 766 A.2d 702
 
 (2001) (noting that Restructuring Statute "directed the PUC to design a restructuring plan in which electric generation services and rates would be extracted from the traditional regulatory scheme, unbundled, and subjected to market competition" (quotations omitted) ).
 

 The term "restructuring" occurs, in some form, throughout RSA chapter 374-F, including, notably, in the statute's title: "Electric Utility Restructuring."
 
 See
 

 Greenland Conservation Comm'n v. N.H. Wetlands Council
 
 ,
 
 154 N.H. 529
 
 , 534,
 
 913 A.2d 776
 
 (2006) ("The title of a statute is not conclusive of its interpretation, but it is a significant indication of the intent of the legislature in enacting a statute." (citations omitted) ). It is not a term the legislature used without context. As the legislature noted in its findings preceding the sections codified as the Restructuring Statute: "Restructuring of electric utilities to provide greater competition and more efficient regulation is a nationwide phenomenon and New Hampshire must aggressively pursue restructuring and increased customer choice in order to provide electric service at lower and more competitive rates." Laws 1996, 129:1, III.
 

 By way of background, "[u]ntil relatively recently, most state energy markets were vertically integrated monopolies,"
 
 Hughes v. Talen Energy Marketing, LLC
 
 , --- U.S. ----,
 
 136 S.Ct. 1288
 
 , 1292,
 
 194 L.Ed.2d 414
 
 (2016), in which "electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems,"
 
 New York v. FERC
 
 ,
 
 535 U.S. 1
 
 , 5,
 
 122 S.Ct. 1012
 
 ,
 
 152 L.Ed.2d 47
 
 (2002). Such a utility's "sales were 'bundled,' meaning that consumers paid a single charge that included both the cost of the electric energy
 and the cost of its delivery."
 

 Id.
 

 In the 1990s, the Federal Energy Regulatory Commission "commenced a program of deregulating and 'unbundling' the wholesale electric power industry by restructuring and separating electrical generation, transmission, and distribution."
 
 MPS Merchant Services, Inc. v. F.E.R.C.
 
 ,
 
 836 F.3d 1155
 
 , 1160 (9th Cir. 2016). Subsequently, many states restructured and deregulated their own electric energy markets.
 
 See, e.g.
 
 ,
 
 id.
 
 ;
 
 Northeast Energy v. Mahar Regional School
 
 ,
 
 462 Mass. 687
 
 ,
 
 971 N.E.2d 258
 
 , 264 n.14 (2012) (noting that "[a]doption of the [Massachusetts] restructuring act followed similar changes in Federal law that created competition within the wholesale electric power industry").
 

 Critical to interpreting the Restructuring Statute is the recognition that in the context of this "nationwide phenomenon," Laws 1996, 129:1, III, restructuring is inextricably tied to competition: "Restructuring is nothing short of a complete reordering of the famously staid electric utility industry" and "[t]he
 
 raison d'etre
 
 of restructuring is to bring about free market-like competition in the industry." Joel B. Eisen,
 
 The Environmental Responsibility of the Regionalizing Electric Utility Industry
 
 , 15 Duke Envtl. L. & Pol'y F. 295, 313 (2005). Our state legislature clearly used the term in that context. It found that although "[m]onopoly utility regulation has historically substituted as a proxy for competition in the supply of electricity[,] ... market forces can now play the principal role in organizing electricity supply for all customers instead of monopoly regulation." Laws 1996, 129:1, IV. The legislature therefore concluded that "[i]t is in the best interests of all the citizens of New Hampshire that the general court, the executive branch, and the public utilities commission work together to establish a competitive market for retail access to electric power as soon as is practicable." Laws 1996, 129:1, V. Moreover, the legislature explicitly linked the Restructuring Statute's "transition to competitive markets for electricity" to the "directives of part II, article 83 of the New Hampshire constitution" to protect the people's "inherent and essential right" to "[f]ree and fair competition in the trades and industries." RSA 374-F:1, II.
 

 The Restructuring Statute, which uses some form of the word "compete" (
 
 e.g.
 
 , "competition," "competitive") no fewer than 55 times, was clearly enacted "to create competitive markets
 
 that are expected to produce
 
 lower prices for all customers than would have been paid under the current regulatory system." RSA 374-F:3, XI (Supp. 2017) (emphasis added). Eversource itself recognizes that fact, but asserts that "twenty years later, the [PUC] and ISO-NE[, the regional electricity market administrator,] have recognized that competition has not achieved its stated purposes." Even assuming that to be the case, however, if the legislature's chosen solution has not achieved the anticipated results, it is neither the PUC's nor this court's place to rewrite the statute.
 
 See
 

 Appeal of THI of NH at Derry, LLC
 
 ,
 
 168 N.H. 504
 
 , 512,
 
 131 A.3d 944
 
 (2016) (noting that when statute's plain language reflects that the asserted statutory goal of keeping nursing home beds in service "is to be accomplished only in the narrow circumstances to which the statute applies[,] ... the [Health Services Planning and Review] Board had no authority to ignore this requirement to further an arguably more general statutory objective"). The type of policy about-face that would be required to authorize Eversource's proposal should be made, if at all, by the legislature.
 
 See, e.g.
 
 ,
 
 Dolbeare v. City of Laconia
 
 ,
 
 168 N.H. 52
 
 , 57,
 
 120 A.3d 146
 
 (2015) (declining to consider public policy argument in construing
 statute because "matters of public policy are reserved for the legislature").
 

 Similarly, the contention that the PUC impermissibly elevated the importance of the functional separation principle over RSA 374-F:3's other policy principles-or that functional separation itself was merely a suggestion that the legislature thought the PUC ought to consider-ignores the importance that insisting upon "at least functional separation" plays in implementing and maintaining competition in a formerly vertically integrated industry in which some components remain regulated monopolies. The term "functional separation," while not explicitly defined in the Restructuring Statute,
 
 see
 
 RSA 374-F:2 (Supp. 2017) (definitions section), may generally be understood to mean "requiring utilities to separate their competitive generation functions from their regulated transmission and distribution functions." Sonnet C. Edmonds,
 
 Retail Electric Competition in Kansas: A Utility Perspective
 
 ,
 
 37 Washburn L.J. 603
 
 , 632 (1998). It may also be seen as a less drastic alternative to divestiture, under which "a utility would have to divest itself of all or a portion of its generating assets to another entity or entities in order to remain in the distribution business."
 

 Id.
 

 at 631 ;
 
 see
 

 also
 
 Paul L. Joskow & Roger G. Noll,
 
 The Bell Doctrine: Applications in Telecommunications, Electricity, and Other Network Industries
 
 ,
 
 51 Stan. L. Rev. 1249
 
 , 1304 (1999) (noting that an alternative approach to "structural separation,"
 
 i.e.
 
 , divestiture, "involves functional separation of generation, transmission, and distribution (i.e., costs separations and certain operational separations between competitive and regulated segments) within existing vertically integrated firms, combined with open access and pricing rules for use of the transmission and distribution networks by competing suppliers of generation" (emphases omitted) ).
 

 The importance of at least functionally separating generation services from transmission and distribution services is that achieving and maintaining a competitive market in generation services depends upon it. As Professors Joskow and Noll explain, "vertical integration between [the monopolistic transmission and distribution functions] and the [competitive] generation function effectively turns the supply of generating service into a monopoly as well," despite the existence of competitors in the generation market. Joskow & Noll,
 
 supra
 
 at 1298. Thus, the Supreme Judicial Court of Massachusetts similarly explained that functionally separating generation services from transmission and distribution services in that state's restructuring act "was regarded as a necessary first step in moving toward a fully competitive generation market" because such separation "limit[s] a company's ability to provide itself an undue advantage in buying or selling services in competitive markets."
 
 Northeast Energy
 
 ,
 
 971 N.E.2d at 265
 
 (quotations omitted).
 

 I acknowledge that the legislature used the term "should" in RSA 374-F:3, III (Supp. 2017). I would not, however, "consider [that] word[ ] ... in isolation."
 
 Appeal of Michele
 
 ,
 
 168 N.H. 98
 
 , 102,
 
 123 A.3d 255
 
 (2015) (noting that "we do not consider words and phrases in isolation, but rather within the context of the statute as a whole" (quotation omitted) ). To conclude, as the majority does, that "[h]ad the legislature intended to require the PUC to prioritize the 'functional separation' policy principle above all other principles identified in the statute, and to require 'functional separation' in all circumstances, it would have said so," turns a blind eye to the legislature's manifest intent to "transition to competitive markets for electricity." RSA 374-F:1, II.
 

 I note that the Massachusetts Supreme Judicial Court, in
 
 ENGIE Gas v. Department of Public Utilities
 
 ,
 
 475 Mass. 191
 
 ,
 
 56 N.E.3d 740
 
 (2016), vacated an order of the Massachusetts Department of Public Utilities in which "the department determined that the plain language of [the Massachusetts restructuring act] provides the department with the statutory authority to approve gas capacity contracts entered into by electric distribution companies, so long as the department first determines that such long-term contracts are in the public interest" and "further concluded that it could properly allow cost recovery for the contracts, including the cost of building the necessary pipeline infrastructure, through electric distribution rates."
 
 ENGIE Gas
 
 ,
 
 56 N.E.3d at 744
 
 . The court noted that the language of the statutory provision at issue neither "expressly forbid [the department] from reviewing and approving contracts by electric distribution companies for gas ... [n]or ... clearly permit[ted] such activity."
 

 Id.
 

 at 748
 
 . Nevertheless, the court concluded that the department's order was "invalid in light of the statutory language and purpose of [that provision],
 
 as amended by the restructuring act
 
 , because, among other things, it would
 
 undermine the main objectives of the act
 
 and reexpose ratepayers to the types of financial risks from which the Legislature sought to protect them."
 

 Id.
 

 at 742
 
 (emphases added).
 

 Similarly, here, the PUC determined that Eversource's proposal "is fundamentally inconsistent with the purposes of restructuring." The PUC concluded-sustainably, I believe-that "the Capacíty Contract is a component of 'generation services' under RSA 374-F:3, III," and that "[i]ncluding such a generation-related cost in distribution rates would combine an element of generation costs with distribution rates and conflict with the functional separation [principle]." In other words, the PUC implicitly concluded (notwithstanding the use of an arguably permissive "should," as opposed to a directive "shall," in a single provision of the Restructuring Statute) that Eversource's proposal ran directly contrary to the legislature's manifest intent, expressed throughout the statute, to extricate generation from transmission and distribution and to establish a competitive market for the former. RSA 374-F:3, III.
 
 But
 

 see
 
 RSA 374-F:1, I ("Increased customer choice and the development of competitive markets for wholesale and retail electricity services are key elements in a restructured industry
 
 that will require
 
 unbundling of prices and services and
 
 at least functional separation
 
 of centralized generation services from transmission and distribution services." (emphases added) ). I believe that the PUC's decision is correct, and, in any event, was well within the discretion the legislature delegated to the PUC by providing a set of "interdependent policy principles ...
 
 to guide
 
 the [PUC] in implementing a statewide electric utility industry restructuring plan ... and in regulating a restructured electric utility industry." RSA 374-F:1, III (emphasis added). I respectfully dissent.